IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL INDICTMENT NO.: |
| | : | 2:14-CR-00025-RWS-JCF |
| FREDERICK FITZGERALD | : | |
| HINTON | : | |

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Suppress (Doc. 28) and Amended Motion To Suppress (Doc. 31). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motions be **DENIED**.

## Procedural History

A Superseding Indictment filed on July 1, 2013 charges Defendant Frederick Fitzgerald Hinton ("Defendant") and his co-defendant LaMichael Jontavious Lenzy with using a firearm to rob a convenience store. (Doc. 22). Defendant Hinton filed a motion to suppress DNA evidence (Doc. 28), and then filed an amended motion on July 30, 2014 in which he also moves to suppress evidence of a cell phone seized by law enforcement officers. (Doc. 31). On December 18, 2014, the Court conducted a hearing on Defendant's motions (*see* Doc. 37), and a transcript[1] of that hearing was filed on January 18, 2015 (Doc. 38). Defendant filed a post-hearing brief on February 10, 2015 (Doc. 41), the Government

---

[1] References to that transcript will be designated as "Tr. __."

1

submitted a response on March 18, 2015 (Doc. 43), and Defendant replied on April 1, 2015 (Doc. 45).  With briefing now complete, the undersigned considers the merits of Defendant's motions.

## **Facts**[2]

On October 20, 2010, Defendant pleaded guilty to the offenses of burglary and obstruction of an officer in the Superior Court of Clarke County, Georgia, and was sentenced under Georgia's First Offender Act to seven years, 30 months of which to be served in confinement (with credit for time served since November 12, 2009), and the remainder of the sentence to be served on probation.  (*See* Tr. 29-31; Def. Ex. 2).  While he was incarcerated in the custody of the Georgia Department of Corrections ("DOC"), prison officials took a DNA sample (a cheek swab) and sent it to the Georgia Bureau of Investigation ("GBI") crime lab on June 21, 2011.  (*See* Tr. 32; Def. Ex. 3).  Plaintiff was later released from prison; his probation apparently began on May 13, 2012.  (*See* Tr. 29-30; Def. Ex. 1).

Jose Mundo, a DNA analyst at the GBI crime lab testified that the DOC obtains buccal swabs for DNA for every felony offender that enters the prison system, regardless of whether or not the person has been sentenced under the First Offender statute.  (Tr. 9).  When the crime lab receives DNA samples from the

---

[2] These facts are taken from the testimony of Kevin Hall Thomas, an Investigator with the Jackson County Sheriff's Office, and Jose Mundo, a Forensic Biologist with the GBI crime lab, as well as exhibits admitted during the December 18, 2014 hearing.

DOC, lab personnel process the samples to develop a DNA profile, which they enter into the CODIS[3] DNA database. (Tr. 7-8). When the lab receives the samples from the DOC, personnel does not undertake a review to determine whether or not the samples were taken in compliance with state or federal law before putting the DNA profile in the database because they do not have the resources to conduct such a review.[4] (Tr. 9). Instead, they "accept all samples from the [DOC] under the good faith clause in the statutes." (Tr. 9, 21; *see also* O.C.G.A. § 35-3-165(b)). It is only when the lab determines that a DNA profile in the database matches another sample that personnel may discover that the DNA profile comes from a person who was sentenced as a first offender by reviewing information on the Georgia Crime Information Computer ("GCIC") and other sources such as DOC records. (Tr. 9-10, 23-24). Mundo testified that it is "standard procedure" to then remove the DNA profile of the first offender from CODIS "[b]ecause they are not formally convicted of a felony at that point" and

---

[3] CODIS stands for "Combined DNA Index System." *Maryland v. King*, 133 S.Ct. 1958, 1968 (2013). It "connects DNA laboratories at the local, state, and national level" and "collects DNA provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes." *Id.* CODIS provides "standardization of the points of comparison in DNA analysis," i.e., "13 loci at which the STR alleles are noted and compared," which "are from the non-protein coding junk regions of DNA, and are not known to have any association with genetic disease or any other genetic predisposition." *Id.* (internal quotation omitted). "Thus, the information in the database is only useful for human identity testing." *Id.* (internal quotation omitted).

[4] Mundo estimated that the lab receives 16,000 to 20,000 samples from the DOC per year, and the lab has five to seven staff members. (Tr. 14, 28).

therefore "ineligible for CODIS entry."  (Tr. 26).  Even though it was Mundo's understanding that such DNA profiles were ineligible for inclusion in CODIS, he still reported to law enforcement any matches between those profiles and other samples because he was "not entirely sure if . . . they can pursue that information, if they can obtain a search warrant based on that information from an individual that was sentenced under the First Offender Act."  (Tr. 26).  He "was advised to just continue reporting our CODIS matches as we have been, but just notify law enforcement that this individual was under the First Offender Act at the time that the sample was collected initially and entered into CODIS" and that "[i]f that's a lead that they can pursue, then in order to continue through the match process, we would require a new sample."  (*Id.*).

On November 9, 2013, Investigator Kevin Thomas of the Jackson County Sheriff's Office began an investigation of an armed robbery that occurred at a convenience store earlier on that date.  (Tr. 46-47).  Investigators collected evidence from the scene of the robbery, which was submitted to the GBI crime lab. (*Id.*).  Thomas received an April 24, 2014 crime lab DNA report from Mundo, indicating that DNA samples taken from the evidence from the crime scene matched Defendant's DNA profile and the DNA profile of LaMichael Lenzy.  (*See* Tr. 32-33; Def. Ex. 3).  As for Defendant, Mundo also wrote that Defendant had been "sentenced under the first offender act (O.C.G.A. 42-8-60)," and "[t]his

4

offender DNA profile will be removed from the database." (*Id.*).  The report also stated

> This information is provided only as an investigative lead, and any possible connection or involvement of these individuals to the case must be determined through further investigation.
> To proceed, we require [] new biological samples from the offenders be submitted as soon as possible.  Upon submission, the offenders will be added as [] official suspects and a new DNA report will follow.

(*Id.*).

After he received the crime lab report, Investigator Thomas interviewed Defendant at the Clarke County jail.[5]  (Tr. 50).  Thomas admitted that, but for the crime lab report indicating that Defendant's DNA profile matched the crime scene sample, Defendant would not have been a suspect in the armed robbery; he had no other evidence linking Defendant to the crime.  (Tr. 51).  Thomas then sought and obtained warrants to collect DNA samples, i.e., saliva samples, from Hinton and Lenzy, to send to the crime lab for comparison to the samples obtained from the crime scene.  (Tr. 47-49; *see also* Govt. Exs. 1, 2).  Thomas also applied for and obtained a search warrant to seize and search Defendant's cell phone.  (Tr. 49-50; *see also* Govt. Exs. 4, 5).  Thomas "was not familiar with the First Offender status as to whether or not their DNA sample should have [gone] into CODIS or not," and when he applied for the search warrants, he did not know whether or not

---

[5] Defendant was incarcerated at that point "for felony probation violation."  (*See* Govt. Ex. 2 at 1).

Defendant's DNA profile should have been in CODIS.  (Tr. 48).  When he read the information on the report that the profile "will be removed from the database" (Def. Ex. 3), that statement did not mean anything to him.  (Tr. 55).  He viewed this situation as no different from his other cases where he had received notifications of a CODIS match or "hit."  (Tr. 48-49).

After Investigator Thomas obtained the search warrants and new DNA samples from Defendant and submitted them to the crime lab, he spoke with Mundo.  (Tr. 51, 55-56).  Mundo told Thomas that Defendant's "DNA should not have been in CODIS because he had been charged in Clarke County under First Offender status, and due to that first offender status he was not supposed to be in CODIS."  (Tr. 51-52).  Thomas did not understand that to be the case when he applied for the search warrants and did not believe that the information about Defendant's First Offender status pertained to the search warrants, so he had not put in his search warrant affidavits information about Defendant's First Offender status or the crime lab report's indication that Defendant's "DNA profile will be removed from the database."  (Tr. 52, 58-59; *see also* Def. Ex. 3).  At some point after determining that Defendant's DNA profile (the one made during his incarceration) matched a sample taken from crime scene evidence, Mundo expunged that DNA profile from the database.  (Tr. 12-13).  He proceeded to

compare the sample Thomas obtained pursuant to the May 5, 2014 search warrant with the sample from the crime scene.  (Tr. 13).

## Discussion

Defendant contends that because he was sentenced under Georgia's First Offender statute, he was not a convicted felon, and therefore, the analysis of his DNA and creation of a DNA profile, entry of his DNA profile into the CODIS database, and retention of his DNA profile in CODIS were unreasonable and violated the Fourth Amendment.  (*See* Doc. 41 at 21-27).  Defendant therefore argues that the Court should suppress evidence of the match between his improperly retained DNA profile and the DNA obtained from evidence found at the crime scene, and should also suppress evidence seized pursuant to search warrants issued as a result of that DNA match, including a subsequent DNA sample taken from Defendant, the match of that sample to the DNA found at the crime scene, and Defendant's cell phone.  (*Id.* at 27-38).  Thus, the resolution of Defendant's motions turns on a determination of whether any of the following actions violated Defendant's Fourth Amendment rights: (1) the initial collection of Defendant's DNA, creation of a DNA profile, and entry of that profile in CODIS while Defendant was incarcerated; (2) the continued retention and use of Defendant's DNA profile to match the DNA sample obtained from evidence at the crime scene following his release from incarceration but while he was still on

7

probation; and (3) the use of information concerning that match to apply for and obtain search warrants authorizing the seizure and search of his cell phone and the gathering of another DNA sample from Defendant, used to match the DNA sample from the crime scene.

## I.   Initial Collection, Analysis, and Storage of Defendant's DNA Sample

While Defendant was incarcerated pursuant to his October 20, 2010 sentence for burglary and obstruction of an officer under Georgia's First Offender Act, prison officials obtained his DNA sample and sent it to the GBI crime lab for creation of a profile and storage of that profile in CODIS, pursuant to Georgia's DNA statute, O.C.G.A. § 35-3-160 *et seq.* (formerly O.C.G.A. § 24-4-60 *et seq.*). That statute provides in relevant part:

> (b)   Any person convicted of a felony offense who is held in a detention facility or placed on probation shall at the time of entering the detention facility or being placed on probation have a sample of his or her blood, an oral swab, or a sample obtained from a noninvasive procedure taken for DNA . . . analysis to determine identification characteristics specific to the person.  The provisions and requirements of this Code section shall also apply to any person who has been convicted of a felony prior to July 1, 2011, and who currently is incarcerated in a detention facility, serving a probation sentence, or serving under the jurisdiction of the Board of Pardons and Paroles for such offense.  It shall be the responsibility of the detention facility detaining or entity supervising a convicted felon to collect the samples required by this Code section and forward the sample to the division unless such sample has already been collected by the department or another agency or entity.

(c)  The analysis shall be performed by the division.[6]  The division shall be authorized to contract with individuals or organizations for services to perform such analysis.  The identification characteristics of the profile resulting from the DNA analysis shall be stored and maintained by the bureau in a DNA data bank and shall be made available only as provided in Code Section 35-3-163.

O.C.G.A. § 35-3-160; *see also* O.C.G.A. § 35-3-163(a) ("It shall be the duty of the bureau to receive samples and to analyze, classify, and file the results of DNA identification characteristics of samples submitted pursuant to Code Section 35-3-160 and to make such information available as provided in this Code section."). Thus, Georgia's DNA statute requires that the Department of Corrections shall take a DNA sample, through a cheek swab, of all incarcerated persons convicted of a felony offense,[7] and the GBI shall analyze those samples, create a DNA identification profile, and enter that profile in a database.

Defendant contends, however:

The specific mandate of the Georgia DNA Act, that it applies only to 'convicted offenders, is clear throughout the act.  Whether or not the offender is a prisoner or a probationer, the conviction requirement remains intact.  The extraction of the DNA sample, its analysis,

---

[6] " 'Division' means the Division of Forensic Sciences of the Georgia Bureau of Investigation."  O.C.G.A. § 35-3-160(a)(2).

[7] The Georgia Department of Corrections Standard Operating Procedures ("SOP") IIA24-0001 governing the collection of inmate DNA samples is somewhat confusing on this point.  The SOP states that "[t]hose persons sentenced under the First Offender Act will not be subject to the process of this Standard Operating Procedure" (Govt. Ex. 3 at 2), but then in listing offenders eligible for DNA testing, it includes "an offender sentenced under the First Offender Act only during incarceration in a state correctional facility."  (*See id.* at 2-3).  That conflict is not material to the Court's resolution of Defendant's motions.

creation of a DNA profile, the entry into a database and dissemination to law enforcement are all predicated by the offender's status as a 'convicted' person.  It therefore logically follows that it does not apply to an 'unconvicted' First offender.

(Doc. 41 at 15).  The undersigned disagrees.  Defendant was sentenced under Georgia's First Offender Act, which provides in relevant part, "Upon fulfillment of the terms of probation, upon release by the court prior to the termination of the period thereof, or upon release from confinement, the defendant shall be discharged without court adjudication of guilt," and "the discharge shall completely exonerate the defendant of any criminal purpose and shall not affect any of his or her civil rights or liberties; and the defendant shall not be considered to have a criminal conviction."  O.C.G.A. § 42-8-62(a).  "The expungement of first offender sentences is always dependent upon successful completion of the sentence."  *Bradford v. United States*, No. 7:10-CV-90075-WLS *et al*., 2010 U.S. Dist. LEXIS 54399, at *2 n.1 (M.D. Ga. Apr. 21, 2010).

There is no evidence in the record that Defendant fulfilled all the terms of his sentence under the First Offender Act and was discharged under that Act prior to any of the events giving rise to this motion.  He was incarcerated when officials obtained his DNA, created a DNA profile, and stored the profile in CODIS.  It appears that he was still on probation pursuant to the terms of his October 2010 sentence when his DNA profile was matched to the crime scene evidence (*see* Def. Exs. 1, 2), and when Investigator Thomas obtained the May 5, 2014 search

warrants, Defendant had been arrested on a probation violation (*see* Govt. Ex. 2). Moreover, the First Offender Act provides that while Defendant was incarcerated, he was "deemed to have been convicted of the offense during such term of confinement for all purposes except that records thereof shall be treated as any other records of first offenders under this article and except that such presumption shall not continue after completion of such person's confinement sentence." O.C.G.A. § 42-8-65(c). "Upon completion of the confinement sentence, such person shall be treated in the same manner and the procedures to be followed by the court shall be the same as in the case of a person placed on probation under this article." *Id.* Neither the DNA statute or the First Offender Act indicate that incarcerated persons sentenced under the First Offender Act—who are deemed to be convicted during their incarceration, O.C.G.A. § 42-8-65(c)—are exempt from the requirements of the DNA act.

Thus, because Defendant was incarcerated and deemed a convicted felon during his incarceration, even as a First Offender, Georgia's DNA Act required prison officials to take Defendant's DNA's sample and forward it to the GBI for "DNA . . . analysis to determine identification characteristics specific to the person," and further required the GBI to perform that analysis and to "store[] and maintain[]" the DNA analysis "in a DNA data bank." *See* O.C.G.A. § 35-3-160(b) & (c); *see also* O.C.G.A. § 35-3-163(a) ("It shall be the duty of the bureau to

11

receive samples and to analyze, classify, and file the results of DNA identification characteristics of samples submitted pursuant to Code Section 35-3-160 and to make such information available as provided in this Code section.").

The undersigned acknowledges that Jose Mundo with the GBI crime lab testified that DNA profiles from persons who are sentenced under the First Offender statute, such as Defendant, are "not eligible for CODIS" because "they are not technically convicted of a felony." (*See* Tr. 12, 42). He further testified that he would take a first offender's DNA profile out of the database, regardless of whether the person was incarcerated or not (Tr. 16), thus indicating that he believes that, even during a period of incarceration, a first offender's DNA profile should not be included in the database. The text of both the First Offender statute and Georgia's DNA statute do not indicate that Defendant's DNA profile was "not eligible for CODIS," in particular while he was incarcerated. The First Offender statute clearly provides that while he was incarcerated, Defendant was "deemed to have been convicted of the offense during such term of confinement," O.C.G.A. § 42-8-65(c), and the DNA statute clearly provides that the DOC shall obtain a DNA sample from all persons "convicted of a felony offense who is held in a detention facility," that the DOC shall provide that sample to the GBI, and the GBI shall "analyze, classify, and file the results of DNA identification characteristics" of the samples provided by the DOC. O.C.G.A. §§ 35-3-160(b) & 35-3-163(a).

12

Nor is Mr. Mundo's understanding that Defendant's DNA profile should not have been included in CODIS—even during his incarceration—supported by case law from this Court.  As District Judge Richard W. Story explained in *Tobias v. Georgia Department of Corrections*, Defendant was "deemed a convicted felon at all times during the period [he was] serving [his] term of confinement," and "[a]s an incarcerated convicted felon, [Defendant was] required to submit a DNA sample to GDOC *for analysis and storage* in a GBI data bank."  No. 2:08-CV-62-RWS, 2009 U.S. Dist. LEXIS 7532, at *6-7 (N.D. Ga. Feb. 3, 2009) (emphasis added); *see also Davis v. Ga. Dep't of Corr.*, No. 2:08-CV-59-RWS, 2009 U.S. Dist. LEXIS 52532, at *7-8 (N.D. Ga. June 19, 2009) (similarly rejecting the plaintiff's argument that she was not a convicted felon for purposes of Georgia's DNA statute (formerly O.C.G.A. § 24-4-60) because she was sentenced under Georgia's First Offender Act: "Even assuming that Plaintiff has completed her term of confinement in prison, a review of Plaintiff's complaint reflects that she had been serving her state sentence under the Act at the time the DNA sample was collected," was "deemed a convicted felon at all times during the period she served her term of confinement in prison," and "[a]s an incarcerated, convicted felon, Plaintiff was therefore required to submit a DNA sample to GDOC *for analysis and storage* in a GBI data bank." (emphasis added)).

13

Moreover, the critical inquiry before the Court is whether the challenged search violated Defendant's Fourth Amendment rights, not state law. *See United States v. Noriega*, 676 F.3d 1252, 1263 n.4 (11th Cir. 2012) ("[T]he district court was not required to suppress the evidence on the ground that the state rule had been violated because federal law, not state law, governs the admissibility of evidence in federal court, and 'complaints that the evidence was obtained in violation of state law are of no effect.' " (quoting *United States v. Glinton*, 154 F.3d 1245, 1252 (11th Cir. 1998))); *see also United States v. Torres*, No. CR414-348, 2015 U.S. Dist. LEXIS 6330, at *7-10 (S.D. Ga. Jan. 14, 2015) (rejecting the defendant's reliance on the state agents' violation of a state statute concerning the issuance of subpoenas in support of his motion to suppress evidence because " 'federal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state, so long as the search complied with the Fourth Amendment' " (quoting *United States v. Wheelock*, 772 F.3d 825, 830 (8th Cir. 2014))), *adopted by* 2015 U.S. Dist. LEXIS 45528 (S.D. Ga. Apr. 7, 2015); *United States v. Hill*, No. CR 114-028, 2014 U.S. Dist. LEXIS 151854, at *9-10 (S.D. Ga. Sept. 15, 2014) (rejecting defendant's contention that evidence of recordings made without his consent violated state law and therefore must be suppressed because "federal law requires consent of only one party to the conversation," and "[s]o long as one party to the record conversation knows about and consents to it, there is no Fourth

14

Amendment prohibition to using such evidence in a criminal prosecution"), *adopted by* 2014 U.S. Dist. LEXIS 150711 (S.D. Ga. Oct. 23, 2014).

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend IV. Turning to whether the collection of Defendant's DNA sample, the analysis of that sample to create a DNA identification profile, and the entry of that profile on CODIS violated Defendant's Fourth Amendment rights, the undersigned easily concludes that they did not. "Because the '[t]ouchstone of the Fourth Amendment is reasonableness, . . . the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *United States v. Boynton*, 337 Fed. Appx. 801, 803 (11th Cir. 2009) (unpublished opinion) (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001) (internal quotation omitted)).

In *Padgett v. Ferrero*, 294 F. Supp. 2d 1338, 1344 (N.D. Ga. 2003), District Judge Thomas W. Thrash, Jr., found that Georgia's DNA statute does not violate the Fourth Amendment "[b]ecause DNA sampling is reasonable is light of the

strong interests of the state and the diminished privacy interests of [inmates]."   In

rejecting the inmate plaintiffs' "claim that the statute violates their right to privacy

under the Federal and Georgia constitutions," Judge Thrash explained:

> The identification of convicted felons is a legitimate state interest of
> great importance, and though oral swabbing or taking a blood sample
> is slightly more invasive than fingerprinting or photographing, it is
> justified by its increased accuracy and immutability.   Upon
> imprisonment, convicted felons are subject to much greater losses of
> privacy than the minimal intrusion necessary to obtain a DNA sample
> . . . .   Plaintiffs' right to privacy in their identification, assuming one
> exists, is substantially outweighed by the interests of the state in
> having available a DNA database that can be used in solving crimes
> and exonerating the innocent.

*Id.*  The Eleventh Circuit affirmed that decision, *Padgett v. Donald*, 401 F.3d 1273

(11th Cir. 2005), holding that Georgia's DNA statute—which "require[s]

convicted, incarcerated felons to provide a sample of their DNA to the Georgia

Department of Corrections . . . for analysis and storage in a data bank maintained

by the [GBI]"—does not violate prisoner's Fourth Amendment rights.  *Id.* at 1274-

75.

The court acknowledged in *Padgett* that the "required extraction of saliva for

DNA profiling constitutes a 'search' within the meaning of the Fourth

Amendment," and then considered whether such a search, conducted without a

warrant, was reasonable.  *Id.* at 1277.  In doing so, it utilized the approach set out

in *United States v. Knights*, 534 U.S. 112 (2001) in considering whether

warrantless searches of probationers were reasonable under the Fourth

Amendment, i.e., "whether the statute is reasonable under a totality of the circumstances analysis." *Id.* at 1280. Thus, the court "employ[ed] a balancing test, weighing the degree to which the search intrudes on an individual's privacy against the degree to which it promotes a legitimate governmental interest." *Id.* at 1280 (citing *Knights*, 534 U.S. at 118-19). The court then held that the statute does not violate the Fourth Amendment because "Georgia's legitimate interest in creating a permanent identification record of convicted felons for law enforcement purposes outweighs the minor intrusion involving in taking prisoners' saliva samples and storing their DNA profiles, given prisoners' reduced expectation of privacy in their identities[.]" *Id.*; *see also Davis,* 2009 U.S. Dist. LEXIS 52532, at *6-9; *Tobias,* 2009 U.S. Dist. LEXIS 7532, at *5-7. More recently, the Supreme Court upheld the constitutionality of Maryland's DNA statute, which authorizes the collection of DNA samples for analysis from all persons merely *arrested* on felony charges. *Maryland v. King*, 133 S. Ct. 1958 (2013). Thus, the undersigned finds that the statutorily required collection of Defendant's DNA sample for GBI analysis, creation of a DNA profile, and input of that profile into CODIS while he was incarcerated did not violate his Fourth Amendment rights.

Defendant concedes that "[a] challenge to the taking of the defendant's DNA while he was serving the confinement part of his First Offender sentence is foreclosed to the defendant by O.C.G.A. § 42-8-65(c) and also by Judge Story's

holdings in *Tobias* . . . and *Davis*[.]"   (Doc. 41 at 21).   He then appears to challenge the subsequent "analysis, creation of his DNA profile, [and] entry in CODIS," which also occurred while he was incarcerated.   (*See id.*).   He fails, however, to explain why "Georgia's legitimate interest in creating a permanent identification record of convicted felons for law enforcement purposes," which supports the taking of a sample as required under the statute, *see Padgett*, 401 F.3d at 1280, does not also justify the statutorily required *analysis* of that sample for identification purposes and entry of that DNA identification profile in the database, i.e., CODIS, particularly while Defendant was incarcerated.   It is difficult to imagine how the taking of a DNA sample which then goes unanalyzed furthers Georgia's legitimate interest in creating a permanent identification record of convicted felons for use in "solving crimes and exonerating the innocent." *Padgett*, 294 F. Supp. 2d at 1344.   Nor does case law indicate that the creation of a DNA profile and entry of that profile on CODIS were an unreasonable intrusion on Defendant's expectation of privacy, which was by necessity greatly diminished due to his incarceration.

The undersigned finds Georgia's interest in maintaining a DNA database for those who have been incarcerated for felony offenses applies with equal force to those sentenced and incarcerated under the First Offender Act for a felony offense and therefore deemed to be convicted during their incarceration.   Although a first

offender who fulfills the terms of his sentence, including probation, "shall be discharged without court adjudication of guilt" and "shall not be considered to have a criminal conviction," O.C.G.A. § 42-8-62, that benefit is conditioned on the successful completion of the offender's sentence. "[T]he trial court 'may' enter an adjudication of guilt" if the first offender violates the terms of his probation, although it is not require to do so. *Davis v. State*, 537 S.E. 2d 663, 665 (Ga. 2000); *see also* O.C.G.A. § 42-8-60(b). Given the significant ramifications of a first offender's discharge of a felony offense, i.e., "adjudication without court adjudication" and lack of criminal conviction for that offense, the state surely has an interest in creating and storing even a first offender's DNA profile for use in determining whether he has subsequently committed another offense for which he may lose the benefit of the being sentenced as a first offender.

Accordingly, the undersigned finds that the taking of Defendant's DNA sample, the analysis of that sample and creation of a DNA profile, and inclusion of that profile on CODIS while he was incarcerated did not violate his Fourth Amendment rights. Therefore, to the extent that Defendant moves to suppress evidence on the grounds that a DNA identification profile was unlawfully developed from his DNA sample and entered into CODIS, it is **RECOMMENDED** that his motions be **DENIED**.

19

The undersigned now considers whether the retention of Defendant's DNA profile and subsequent use of that profile to match DNA found at the crime scene—after he was no longer incarcerated but was still on probation under the First Offender Act—violated his Fourth Amendment rights.

## II.    Retention Of DNA Sample And Comparison To Crime Scene Sample

Georgia's DNA statute provides that "[u]pon request from a prosecutor or law enforcement agency, the bureau may compare a DNA profile from an analysis of a sample from a suspect in a criminal investigation where the sample was [lawfully obtained] to DNA profiles lawfully collected and maintained by the bureau."[8]  O.C.G.A. § 35-3-163(b).  The undersigned finds that Defendant's DNA profile was "lawfully collected," as discussed above, but Defendant contends that it was not "lawfully maintained by the bureau" because once he was released from incarceration, he was no longer deemed convicted under the First Offender Act. Therefore, Defendant argues that his DNA profile should not have been available in CODIS for comparison with the DNA samples taken from the crime scene.  (*See* Doc. 41 at 23-24).

---

[8] The statute further provides that the GBI shall not add the DNA profile from a DNA sample from a suspect "to any DNA data bank except upon conviction as provided in this article."  O.C.G.A. § 35-3-163(b).  Defendant cites that statute in apparent support of his contention that his profile should not have been added, but that section refers to the profiles of *suspects* who are compared to those profiles already lawfully in the system; it is those *suspects'* profiles that cannot be added to the database except upon conviction.

Once Defendant was released from his incarceration and began his probation, he was no longer "deemed convicted" under the First Offender Act. *See* O.C.G.A. § 42-8-65(c).  He was on probation, however, when his DNA profile was compared to the DNA samples taken from items from the crime scene.  (*See* Def. Exs. 1, 2; Govt. Ex. 2 at 1).  Thus, at that point, although he was not deemed convicted, he had also not yet fulfilled the terms of his probation and therefore had not been "discharged without court adjudication of guilt" under the Act.  *See* O.C.G.A. § 42-8-62(a).  Georgia's DNA statute is silent on what should happen to lawfully obtained DNA profiles of incarcerated persons sentenced under the First Offender Act—deemed to be convicted during their incarceration—after their incarceration ends.  The statute provides:

> (b) A DNA sample obtained in good faith shall be deemed to have been obtained in accordance with the requirements of this article and its use in accordance with this article is authorized until a court order directing expungement is obtained and submitted to the bureau.

O.C.G.A. § 35-3-165(b).  Defendant's DNA sample was obtained in compliance with the requirements of the statute while he was incarcerated, thus "obtained in good faith," and therefore, its use to prepare, store, and compare the DNA profile developed from the crime scene sample was "authorized until a court order directing expungement [was] obtained and submitted to the bureau."  No such order is in the record.

21

The statute does provide the following relief for those whose convictions have been reversed:

> (a) A person whose DNA profile has been included in the data bank pursuant to this article may request that it be expunged on the grounds that the conviction on which the authority for including his or her DNA profile was based has been reversed and the case dismissed. The bureau shall purge all records and identifiable information in the data bank pertaining to the person and destroy all samples from the person upon receipt of a written request that such data be expunged, pursuant to this Code section, and a certified copy of the court order reversing and dismissing the conviction.

O.C.G.A. § 35-165(a).  Thus, "[t]he statute does not require the State to purge lawfully collected forensic profiles from its database, or to delete from those profiles information related to unsuccessful criminal prosecutions."  *Fortune v. State*, 685 S.E. 2d 466, 471 (Ga. App. 2009).  Instead, "the statute puts the burden on the defendant to take action to expunge his information from the database under certain conditions, not on the State to do so automatically."  *Id.* at 470.

More importantly, the retention of Defendant's DNA profile in CODIS and use of that profile to match the sample taken from the crime scene did not violate his Fourth Amendment rights.  In the first place, persuasive authority indicates that such retention and use does not constitute a search under the Fourth Amendment, separate from the initial taking of the DNA sample, creation of the DNA profile, and storage of that profile on CODIS.  *See, e.g.*, *Boroian v. Mueller*, 616 F.3d 60, 67-68 (1st Cir. 2010) ("Therefore, we join the other courts to have addressed the

22

issue in holding that the government's retention and matching of Boroian's profile against other profiles in CODIS does not violate an expectation of privacy that society is prepared to recognize as reasonable, and thus does not constitute a separate search under the Fourth Amendment."); *Wilson v. Collins*, 517 F.3d 421, 428 (6th Cir. 2008) ("[T]o the extent the claim is premised on the retention and disclosure of personal DNA information, it does not implicate the Fourth Amendment" (citing *Johnson v. Quander*, 440 F.3d 489 (D.C. Cir. 2006))); *Johnson*, 440 F.3d at 499 (D.C. Cir. 2006) ("[W]e conclude that accessing the DNA snapshots contained in the CODIS database does not independently implicate the Fourth Amendment.  We note that the consequences of the contrary conclusion would be staggering: Police departments across the country would face an intolerable burden if every 'search' of an ordinary fingerprint database were subject to Fourth Amendment challenges.  The same applies to DNA fingerprints.").

In *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012), a case cited by Defendant (*see* Doc. 41 at 19), the court noted that "at least some courts have concluded that once a DNA profile has been lawfully obtained and entered into CODIS, the retention of that profile and 'periodic matching of the profile against other profiles in CODIS for the purpose of identification' is not a search because it does not intrude upon an offender's legitimate expectation of privacy," quoting

*Boroian*, 616 F.3d at 67-68.  690 F.3d at 246.  The court in *Davis* also observed, however, that "[o]ther courts, at least in principle, have left open the possibility that an unrelated examination after DNA retention could be a separate search for Fourth Amendment purposes," citing *United States v. Amerson*, 483 F.3d 73, 85 n.12 (2d Cir. 2007).  690 F.3d at 246-47.  In *Amerson*, the court explained that "[t]here is . . . a second and potentially more serious invasion of privacy occasioned by the [federal] DNA Act," and "the analysis and maintenance of offenders' information in CODIS, the federal database is, in itself, a significant intrusion."  483 F.3d at 85 (internal quotation omitted).  In light of that authority and in an abundance of caution, the undersigned will assume for the sake of discussion that the GBI's retention and use of Defendant's DNA profile to match that profile to crime scene evidence implicated the Fourth Amendment.  The undersigned finds, however, that in balancing "the degree to which the search intrudes on [Defendant's] privacy against the degree to which it promotes a legitimate governmental interest," *Padgett*, 401 F.3d at 1280, the retention and use of Defendant's DNA was reasonable and did not violate the Fourth Amendment.

In considering the weight to be given to Defendant's expectation of privacy, Defendant urges the Court to view him as "an 'unconvicted' First Offender," who "had a right to expect that his records, including the record of his DNA profile, would be kept confidential and excluded from CODIS."  (Doc. 41 at 23-24).  The

24

undersigned disagrees.  First, for the reasons already discussed above, neither the text of Georgia's First Offender and DNA statute, nor relevant case authority support Defendant's asserted expectation that his DNA profile would be "excluded from CODIS."  The undersigned also observes that even when a first offender completes his sentence and is discharged, he has no right to expungement of his public court records, thus indicating an expectation that a first offender's record of his prosecution and sentence shall remain public.  *See* O.C.G.A. § 42-8-62(a) ("The criminal file, docket books, criminal minutes and final record, and all other records of the court relating to the offense of a defendant who had been discharged without court adjudication of guilt pursuant to this subsection shall not be altered as a result of that discharge, except for the entry of discharge thereon required by this subsection, nor shall the contents thereof be expunged or destroyed as a result of that discharge."); *see also State v. CSB,* 297 S.E. 2d 260, 262 (Ga. 1982) (reversing order directing expungement of first offender records).

Furthermore, although Defendant had been released from incarceration when his DNA profile was matched, he was still a probationer.  The degree to which the challenged actions intruded on his privacy was minimal in light of that status. "The Fourth Amendment's protection against unreasonable searches and seizures unquestionably applies to probationers."  *United States v. Wasser*,  586 Fed. Appx. 501, 504 (11th Cir. 2014) (unpublished decision).  "Probationers, however, have a

diminished expectation of privacy and 'are subject to limitations to which ordinary citizens are free.' "  *Id.* (quoting *Owens v. Kelley*, 681 F.2d 1362, 1367-68 (11th Cir. 1982)).

Moreover, as found by the Supreme Court in *King*, "the processing of respondent's DNA sample's 13 CODIS loci did not intrude on [his] privacy in a way that would make his DNA identification unconstitutional."  133 S. Ct. at 1979. The Court explained, "the CODIS loci come from noncoding parts of the DNA that do not reveal the genetic traits of the arrestee," and "alleles at the CODIS loci are not at present revealing information beyond identification."  *Id.* (internal quotation omitted).  The Court in *King* and other courts have also likened the creation and storage of DNA profiles to the maintenance of fingerprint records and explained that the matching of information to such records minimally infringes on a person's legitimate expectation of privacy, if at all.  *See King*, 133 S. Ct. at 1976-77; *Boroian*, 616 F.3d at 67.

On the other side of the scale rests the state's legitimate interests in identifying those it has incarcerated as well as those on probation, and critically, its significant interests in maintaining a database that assists it in apprehending the guilty and exonerating the innocent.  Furthermore, as the Court in *Knights* explained "[i]n assessing the governmental interest side of the balance, it must be remembered that the very assumption of the institution of probation is that the

probationer is more likely than the ordinary citizen to violate the law." 534 U.S. at 120 (internal quotation omitted). "And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply." *Id.* Thus, the Court found, the state's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 121.

The undersigned finds that state's interests in maintaining a DNA database containing the DNA profiles of those who have been previously incarcerated on felony offenses continues after those persons are released from incarceration and outweighs the minor intrusion of maintaining a probationer's lawfully obtained DNA profile in the database. Accordingly, the undersigned finds that the retention and use of Defendant's DNA profile while he was on probation were reasonable under the Fourth Amendment. *See, e.g.*, *Amerson*, 483 F.3d at 85-89 (finding that the taking and storing of probationers' DNA samples under the federal DNA Act did not violate the Fourth Amendment, even after their probation ended, given the limited identifying information the DNA profiles currently contain and limitations

on how the profiles can be released, the reduced expectation of privacy enjoyed by probationers when they provided the DNA samples, and the strong government interests, including its interests in maintaining those profiles to apprehend and convict the guilty and exonerate the innocent); *United States v. Weikert*, 504 F.3d 1, 14-15 (1st Cir. 2007) (concluding "that the government's important interests in monitoring and rehabilitating supervised releases, solving crimes, and exonerating innocent individuals outweigh Weikert's privacy interests, given his status as a supervised release, the relatively minimal inconvenience occasioned by a blood draw, and the coding of genetic information that, by statute, may be used only for purposes of identification").

Moreover, as discussed above, the weight of the state's legitimate interests in apprehending the guilty and exonerating the innocent is not diminished by the fact that Defendant was on probation as a first offender when the match occurred. It can be argued that a probationer sentenced under the First Offender Act has an even greater incentive to conceal his criminal activities than was described in *Knights*, i.e., the loss of first offender treatment for the original offense. Certainly the state maintains a legitimate interest in determining whether a first offender has committed additional offenses before his original offenses—particularly those serious enough to warrant incarceration—are discharged without an adjudication of guilt.

28

Accordingly, to the extent that Defendant moves to suppress evidence on the grounds that his DNA identification profile was unlawfully retained and used to compare to a DNA sample taken from the crime scene, it is **RECOMMENDED** that his motions be **DENIED**.

### III.   Evidence Seized Pursuant To Search Warrants

"Where a search is conducted under the authority of a warrant, the defendant challenging the search carries the burden of showing the warrant to be invalid." *United States v. Kilgore*, No. 1:11-cr-00518-CAP-RGV, 2012 U.S. Dist. LEXIS 154148, at *14 (N.D. Ga. Sept. 13, 2012) (internal quotation omitted), *adopted by* 2012 U.S. Dist. LEXIS 153867 (N.D. Ga. Oct. 26, 2012).   "It is not easy for a Defendant to meet this burden, and a judicial preference is accorded searches under a warrant." *United States v. Teague*, No. 2:10-CR-006-RWS-SSC, 2010 U.S. Dist. LEXIS 142717, at *86 (N.D. Ga. Nov. 22, 2010) (internal quotation omitted), *adopted by* 2011 U.S. Dist. LEXIS 42260 (N.D. Ga. Apr. 19, 2011).

After receiving information from the GBI crime lab that Defendant's DNA identification profile matched that of one of the samples taken from evidence found at the crime scene, Investigator Thomas sought and obtained search warrants, signed by a Jackson County Magistrate Judge on May 5, 2014, authorizing the collection of another DNA sample from Defendant and the seizure

and search of his cell phone.  (*See* Govt. Exs. 1, 2, 4, 5).  Thomas wrote in his

affidavit in support of his search warrant applications:

> On 11/11/2013, Affiant was assigned case # 2013-52236, which was an incident of Armed Robbery, Aggravated Assault, Burglary in the 2nd degree and False Imprisonment.  This incident occurred in Jackson County, on 11/09/2013, at the Mary's B.P. gas station located at the corner of GA. HWY. 11 and Jackson Trail Road, Jefferson, Georgia.
>
> At 9:41 pm, two black male suspects, with black hoodies on and bandanas over their faces (partially) forcefully entered the store, through the front doors, armed with a rifle and pistol.  They assaulted the owner/victim with their firearms by "pistol whipping" him about his head and face and struck him in between his eyes, with the end of the rifle.  They dragged him behind the store counter where the suspect with the pistol continued to beat him with his pistol.  They then stole the whole cash register as well as money from a large safe that was also behind the counter.  They then fled the scene, leaving the victim behind.
>
> Upon the two suspects leaving the scene, they took off their clothing, black hoodie, gloves, cap, bandanas, and left them on Jackson Trail Road.  These items were recovered by the Jackson County Sheriff's Office and turned over to the Affiant.  Affiant secured and packaged these items in order for them to be sent to the Georgia Division of Forensic Sciences, Georgia Bureau of Investigations, for processing for trace evidence and DNA recovery.
>
> On 04/29/2014, Affiant was notified by the Division of Forensics and Sciences, that they had a possible investigative lead, related to a DNA match via a search of the DNA database or CODIS. (Combined DNA Index System)  They had (2) two CODIS matches from the evidence submitted.  One of the matches was to Frederick Fitzgerald Hinton, the suspect who is the focus of this search warrant.

(Govt. Exs. 2, 4).  In support of the search warrant to take another DNA sample,

Thomas also wrote that the GBI crime lab "advised that a new biological sample

would need to be taken from the suspect, in order to further their investigation."
(Govt. Ex. 2 at 6-7).

Defendant argues that the evidence seized pursuant to these warrants must
be suppressed because "the illegal search of the defendant's DNA, including the
processing of the DNA to create a profile and entry and retention in CODIS was
the sole basis upon which the subsequent warrants were sought and issued," and
"[t]he illegally acquired match of the defendant's DNA no doubt tainted the
subsequent search warrants."  (Doc. 41 at 32).  "If a search warrant is based on
probable cause discovered because of an illegal search, generally the search
warrant is tainted and the evidence obtained pursuant thereto is inadmissible."
*United States v. Zarabozo*, 378 Fed. Appx. 939, 940 (11th Cir. 2010) (unpublished
decision) (citing *United States v. McGough*, 412 F.3d 1232, 1240 (11th Cir.
2005)).  As discussed above, the undersigned finds that the creation of a DNA
profile from Defendant's DNA sample, the entry of that profile into CODIS, and
the retention of that profile and use to compare with the samples taken from the
crime scene were not illegal and did not violate the Fourth Amendment.
Accordingly, those actions did not impermissibly taint the search warrants, and the
information concerning the match of DNA from the crime scene to Defendant's
DNA profile properly supported a finding of probable cause to issue the warrants.

Defendant also contends that "[a]ny evidence acquired by means of the search warrants should be suppressed for the additional reason that Thomas intentionally left out of his affidavit, material statements from the same GBI report that he quoted to establish probable cause." (Doc. 41 at 33). Specifically, Defendant points out that Thomas included the information from the crime lab report that one of the samples obtained from crime scene evidence matched Defendant's DNA profile, but he did not include information in the report that Defendant was "sentenced under the first offender act (O.C.G.A. § 42-8-60). This offender DNA profile will be removed from the database." (*See* Doc. 41 at 28-30; *see also* Def. Ex. 3 at 1; Govt. Exs. 2, 4).

"[A] warrant affidavit violates the Fourth Amendment when it contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit.' " *Madiwale v. Savaiko*, 117 F.3d 1321, 1326-27 (11th Cir. 1997) (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)[9]). "A party need not show by direct evidence that the affiant makes an omission recklessly. Rather, it 'is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself.' " *Id.* at 1327 (quoting *Martin*, 117 F.2d at 329).

---

[9] Decisions of the Fifth Circuit handed down before Oct. 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

"Omissions that are not reckless, but are instead negligent, . . . or insignificant and immaterial, will not invalidate a warrant." *Id.* "Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *Id.*

The undersigned finds that Thomas's omission of the information from the crime lab report at issue, i.e., that Defendant was sentenced under the First Offender Act and that his DNA profile "will be removed from the database," was "insignificant and immaterial," and certainly no worse than negligent.  In the first place, as explained above, the First Offender and DNA statutes do not compel a conclusion that Defendant's DNA profile should not have been included or retained in the database due to his First Offender status, particularly where he had not yet completed his First Offender sentence and been discharged. More importantly, the Fourth Amendment does not compel such a conclusion.   In addition, Investigator Thomas testified that he did not understand the significance of the crime lab report's notations about Defendant's First Offender status or understand those notations to indicate that he could not rely on the DNA match to obtain a search warrant.  (*See* Tr. 48-49, 52, 55, 58-59).  His assessment that that information was not material to his applications for search warrants was certainly reasonable in light of the lack of textual support in the First Offender and DNA statutes concerning whether First Offender DNA profiles should be included in

33

CODIS, as discussed above.  Moreover, the crime lab's notation on the report that Defendant's "DNA profile will be removed from the database" does not indicate that it had already been removed or that it should have already been removed.  Nor did it explain why it "will be removed" or indicate in any way that law enforcement and courts were not authorized to rely on evidence of a match between that profile and other samples.  Accordingly, even if Investigator Thomas was mistaken in his belief about the relevance or materiality of the information concerning Defendant's First Offender status, that mistake was reasonable in light of the information he had available and in light of the plain reading of the statute.

In addition, even if Investigator Thomas had included that information in his affidavits, the undersigned finds that it would not "have prevented a finding of probable cause," *Madiwale*, 117 F.3d at 1327, because the affidavit would have still shown that Defendant's DNA profile matched the DNA from the sample taken from the crime scene, thus establishing probable cause.  *See., e.g.*, *Merriel v. Sec'y*, No. 6:11-cv-1100-Orl-37DAB, 2013 U.S. Dist. LEXIS 49019, at *10 (M.D. Fla. Apr. 4, 2013) ("[H]ere the DNA evidence obtained from the victim[] matched a known DNA profile in the CODIS database, thereby establishing a DNA match in this case.  That match was sufficient to make Petitioner a suspect in this case and to establish probable cause to obtain a warrant to compel him to give a DNA sample."); *Brown v. State,* 605 S.E. 2d 885, 887-88 (Ga. App. 2004) (finding that it

34

was unnecessary to show in the search warrant application that the state complied with the DNA statute because the fact that the DNA sample matched the profile in the system established probable cause).

Because the search warrants issued in this case were not tainted by Fourth Amendment violations and were issued on probable cause, it is **RECOMMENDED** that Defendant's motions to suppress evidence seized pursuant to those search warrants be **DENIED**.

## IV.   Good Faith Exception To The Exclusionary Rule

As Defendant correctly points out, the Government did not argue that the good faith exception to the judicially created exclusionary rule described in *United States v. Leon*, 468 U.S. 897 (1984) and its progeny applies to the searches in this case.[10]   (*See* Doc. 45 at 1).   Instead, the Government argues that no Fourth Amendment violation occurred here (*see generally* Doc. 43), and the undersigned agrees.   Nonetheless, out of an abundance of caution—and because Defendant will

---

[10] Defendant also asserts that "the government apparently does not dispute that the creation of the defendant's DNA profile and uploading and retention in CODIS was in violation of the Georgia DNA and First Offender statutes."  (Doc. 45 at 1). To the extent that Defendant implies that the Government conceded those points, the undersigned disagrees. Instead, the Government asserted that "[i]t is not *relevant* whether it was a violation of state law for DOC to collect a buccal swap from defendant, prepare a DNA profile from the saliva captured on the swap, upload defendant's DNA profile into CODIS, and confirm the match that occurred with the unknown sample collected from the crime scene."  (Doc. 43 at 10 (emphasis added)).  The Government argues (correctly), "That is because federal law controls the admissibility of the DNA evidence in this federal criminal case." (*Id.*).

have the opportunity to address this issue in his objections to this Report and Recommendation—the undersigned has considered whether the good faith exception applies.

The exclusionary rule, which provides that evidence seized as the result of a search violative of the Fourth Amendment may not be used by the Government in a subsequent criminal prosecution, is " 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.' " *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).  In *Herring v. United States*, 555 U.S. 135 (2009), the Supreme Court addressed the limited role of the exclusionary rule:

> The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies.  *Illinois v. Gates*, 462 U.S. 213, 223[] (1983).  Indeed, exclusion "has always been our last resort, not our first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591[] (2006), and our precedents establish important principles that constrain application of the exclusionary rule.

*Id.* at 140.  The Court explained that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Id.* at 144.  The purpose of the exclusionary rule is "to deter deliberate,

36

reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.*

In the earlier case of *United States v. Leon*, the Supreme Court modified the exclusionary rule to allow prosecutors to use evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." 468 U.S. at 900. In *Martin*, the Eleventh Circuit Court of Appeals explained what has become known as the *Leon* good faith exception to the exclusionary rule:

> [*Leon*] stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause. The *Leon* good faith exception applies in all but four limited sets of circumstances. *Id.* at 923. The four sets of circumstances are as follows: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319[] (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient − i.e., in failing to particularize the place to be searched or the things to be seized − that the executing officers cannot reasonably presume it to be valid." *Id.* (internal quotation marks omitted).

*Martin*, 297 F.3d at 1313 (original formatting altered).

The first circumstance is clearly not present here—there is no evidence that Investigator Thomas misled the issuing magistrate judge; the undersigned has already addressed and rejected Defendant's contention that Thomas improperly omitted information about Defendant's First Offender status and the notation that is DNA profile "will be removed from CODIS."   Nor is there any evidence that the issuing magistrate judge wholly abandoned his judicial role.  Moreover, the affidavits supporting the warrants were not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," nor were they facially deficient in describing the person and/or places to be searched and things to be seized.

Moreover, there is no evidence that Investigator Thomas's conduct in seeking the warrants was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system," or that he engaged in "deliberate, reckless, or grossly negligent conduct," such that exclusion of the evidence seized is warranted.[11]  *Herring*, 555 U.S. at 144.  He obtained information from the crime lab that Defendant's DNA profile matched that of a DNA sample provided in connection with evidence from

---

[11] The same is true of the actions of Mr. Mundo and any other crime lab personnel involved in the analysis of DNA's profile and matching that profile with the crime scene sample.  The relevant statutes do not clearly state that Defendant's DNA profile should not have been included in CODIS; the DNA statute appears to state the opposite.

the crime scene, and the crime lab report he received did not indicate that Defendant's DNA profile should not have been in CODIS or that it could not be used to make such a match.  Nor do the First Offender Act or Georgia's DNA statute clearly state that Defendant's DNA profile was "CODIS ineligible." Critically, relevant case law does not even suggest that the creation of a DNA profile for incarcerated first offenders, inclusion of that profile in CODIS, and subsequent use of that profile to create matches with other DNA evidence violate the Fourth Amendment.  Accordingly, even if Investigator Thomas's reliance on Defendant's DNA profile match to seek the search warrants did violate the Fourth Amendment, the undersigned finds that the evidence obtained as a result of those warrants need not be suppressed due to the application of the good faith exception to the exclusionary rule.

### Summary

For the reasons discussed below, it is **RECOMMENDED** that Defendant's Motion To Suppress (Doc. 28) and Amended Motion To Suppress (Doc. 31) be **DENIED**.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 4th day of May, 2015.

 /s/ *J. CLAY FULLER*
J. CLAY FULLER
United States Magistrate Judge

39